## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Terrance L. Taylor, being first duly sworn, hereby depose and state

as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.   I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises owned, maintained, controlled, or operated by Microsoft Corporation ("Microsoft"), an electronic communications service/remote computing service provider headquartered at 1 Microsoft Way, Redmond, WA 98052. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Microsoft to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the account(s) identified in Attachment A, including the contents of communications.

2.   I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"). I have been so employed since March 2012. I am currently assigned to the Office of the Resident Agent in Charge, HSI Charleston, West Virginia. During my career, I gained experience in conducting investigations involving computers and the procedures that are necessary to retrieve, collect, and preserve electronic evidence. Through my training and experience, including on-the-job discussions with other law enforcement agents and cooperating suspects, I am familiar with the operational techniques and

organizational structure of child pornography distribution networks as well as the traits and characteristics of child pornography collectors and possessors and their use of computers or other electronic and media devices to facilitate the collection, possession, trade, distribution, access, and receipt of child pornographic materials.

3.    I am a Special Agent with twenty-two years of federal law enforcement experience. Prior to my employment with HSI, I was a Police Officer for two years in Huntington, West Virginia, a Special Agent with the United States Department of State Bureau of Diplomatic Security for six years, a Special Agent with the Naval Criminal Investigative Service for two years, and a Special Agent with the United States Department of State Office of Inspector General for two years. I am a graduate of three federal law enforcement academies at the Federal Law Enforcement Training Center and a graduate of the West Virginia State Police Academy. I graduated from the Criminal Investigator Training Program in 2002, and the Immigration and Customs Enforcement Special Agent Training Program in 2012. As part of these programs, I received extensive training in the areas of law within the jurisdiction of HSI. These areas include laws and regulations pertaining to the importation of various types of merchandise and contraband, prohibited items, money laundering, and various immigration violations. I have more specifically received training in the areas of child pornography and the sexual exploitation and abuse of children. This training includes specialized instruction on how to conduct criminal investigations related to violations of child protection laws pursuant to Title 18, United States Code, Sections 2251, 2252, 2252A, and 2256.

4.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 2252A have been committed by Jason Doliver McSWEENEY. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

## JURISDICTION

6.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. § 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## STATUTORY AUTHORITY

7.    This investigation concerns alleged violations of 18 U.S.C. § 2252A(a) relating to material involving the sexual exploitation of minors.

   a.    18 U.S.C. § 2252A(a)(1) prohibits a person from knowingly transporting or shipping child pornography through the mail or in interstate or foreign commerce by any means, including by computer.

3

b. 18 U.S.C. § 2252A(a)(2) prohibits knowingly receiving or distributing child pornography using any means or facility of interstate or foreign commerce, or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

c. 18 U.S.C. § 2252A(a)(5)(B) prohibits the knowing possession or access with intent to view child pornography that has been mailed or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

8. The following definitions apply to this Affidavit and Attachment B:

a. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

b. "Child Pornography" includes any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involves the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable

4

from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct. See 18 U.S.C. § 2256(8).

  c. "Child Sexual Abuse Material" ("CSAM") has the same meaning as "child pornography."

  d. "Computer" refers to "an electronic, magnetic, optical, electrochemical, or other high-speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." See 18 U.S.C. § 1030(e)(1).

  e. "Computer hardware" consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

f.    "Computer passwords and data security devices" consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

g.    "Computer-related documentation" consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, computer software, or other related items.

h.    "Computer software" is digital information that can be interpreted by a computer and any of its related components to direct the way it works. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

i.    "Mobile computing devices" are handheld electronic devices used for storing data (such as names, addresses, music, photographs, appointments, or notes) and utilizing computer

programs. Some mobile computers also function as wireless communication devices and are used to access the Internet and send and receive e-mail. Mobile computers often include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Many users of these devices also use cloud storage applications to store data such as images and videos in order to back up data, duplicate data in order to access data from other devices, or to free up space on their device. Most mobile computers run computer software, giving them many of the same capabilities as personal computers. For example, mobile computer users can work with word-processing documents, spreadsheets, presentations, internet browsing and chat applications. Mobile computers may also include global positioning system ("GPS") technology for determining the location of the device. Mobile computing devices include, but are not limited to, laptops, tablets, and smartphones. This type of device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and a mobile computer. As the amount of data that people store on their mobile devices has increased, smartphones and other mobile computing devices are also commonly synched with, or connected to, a desktop or laptop computer for backup data storage. This allows users to access selected data, such as photos, emails,

contacts, and documents, across multiple devices, or to recover this data if their mobile device is broken or lost.

j.    A "wireless telephone" (or mobile telephone, cellular telephone, or smartphone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include GPS technology for determining the location of the device.

k.    "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. IP addresses can be dynamic, meaning that the Internet Service Provider ("ISP") assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be

static, if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

l. "Minor" means any person under the age of 18 years. See 18 U.S.C. § 2256(1).

m. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

n. The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, paintings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); mechanical form (including, but not limited to, phonograph records, printing, typing); or electrical, electronic, or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks ("DVDs"), Multi Media Cards ("MMCs"), memory sticks, optical disks, printer buffers, smart cards, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

9. Based on my knowledge, training, and experience in child exploitation and child pornography investigations, and the experience

and training of other law enforcement officers with whom I have had discussions, computers, computer technology, and the Internet have revolutionized the manner in which child pornography is possessed, produced, and distributed. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

 a. Child pornographers can convert images into a computer-readable format with a scanner. With digital cameras, to include cellular telephones or tablets equipped with cameras, the images can be transferred directly onto a computer. A modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Through the Internet, electronic contact can be made to literally millions of computers around the world.

 b. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last decade. These drives can store hundreds of thousands of images at very high resolution. The same is true for mobile computing devices.

 c. The Internet affords collectors of child pornography several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion. Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including

services offered by Internet Portals such as Yahoo! and Gmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer. Even in cases where online storage is used, evidence of child pornography can be found on the user's computer in most cases.

d.    As with most digital technology, communications made from a computer or mobile computing device are often saved or stored on that computer/device. Storing this information can be intentional, for example, by saving an e-mail as a file on the computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication may be automatically stored in many places, such as temporary files or ISP client software, among others. In addition to electronic communications, a computer user's Internet activities generally leave traces in a computer's web cache and Internet history files. Such information is often maintained indefinitely until overwritten by other data.

### PEER TO PEER FILE-SHARING

10.    Peer to Peer ("P2P") file-sharing allows individuals to meet each other through the Internet, engage in social networking, and trade files.

11.   P2P file-sharing is a method of communication available to Internet users through the use of special computer software. Computers are linked together through the Internet on this network, and using this software allows for the sharing of digital files between users on the network. A user first obtains the P2P computer software, which can be downloaded from the Internet. In general, P2P computer software allows the user to set up file(s) on a computer to be shared with others running compatible P2P software.

12.   One aspect of P2P file-sharing is that multiple files may be downloaded in parallel, which permits downloading more than one file at a time. The software utilized to download files from P2P networks will only download from a single source via a direct connection to that computer.

13.   A P2P file transfer is assisted by reference to an IP address. This address, expressed as four sets of numbers separated by decimal points, is unique to the particular Internet connection being used by a particular computer during an online session. The IP address identifies the location of the computer with which the address is associated, making it possible for data to be transferred between computers.

14.   The computer running the file-sharing application, in this case a BitTorrent application, had an IP address assigned to it while it was connected to the Internet. BitTorrent users are able to see the IP address of any computer system that shares or receives files from them.

15.   Third-party software is available to identify the IP address of the P2P computer sending a file. Such software monitors and logs

Internet and local network traffic. The BitTorrent network can be accessed by peer/client computers via many different BitTorrent network client (software) programs, examples of which include: the BitTorrent client program; uTorrent client program; and Vuze client program, among others.

16. These client programs are publicly available and typically are free P2P client software programs that can be downloaded from the Internet.

17. During the installation of typical BitTorrent network client programs, various settings are established which configure the host computer to share files via automatic uploading. Typically, as users download files or pieces of files from other peers/clients on the BitTorrent network, other users (peers/clients) on the network are able to download the files or pieces of files from them, a process which maximizes the download speeds for all users on the network. Once a user has completed the download of an entire file or files, they can also continue to share the file with individuals on the BitTorrent network who are attempting to download all pieces of the file or files, a process referred to as "seeding."

18. Files or sets of files are shared on the BitTorrent network via the use of "Torrents." A "Torrent" is typically a small file that describes the file(s) to be shared. It is important to note that a "Torrent" does not contain the actual file(s) to be shared, but information about the file(s) to be shared needed to complete a download. This information includes things such as the name(s) of the file(s) being referenced in the "Torrent" and the "info hash" of the "Torrent." The

"info hash" is a MD5 hash value of the set of data describing the file(s) referenced in the "Torrent." This set of data includes the MD5 hash value of each file piece in the torrent, the file size(s), and the file name(s). The "info hash" of each "Torrent" uniquely identifies the "Torrent" on the BitTorrent network. The "Torrent" may also contain information on how to locate file(s) referenced in the "Torrent" by identifying "Trackers." "Trackers" are computers on the BitTorrent network that collate information about the peers/clients that have recently reported they are sharing the file(s) referenced in the "Torrent" file. A "Tracker" is only a pointer to peers/clients on the network who may be sharing part or all the file(s) referenced in the "Torrent." "Trackers" do not actually have the file(s) but are used to facilitate the finding of other peers/clients that have the entire file(s) or at least a portion of the file(s) available for sharing. It should also be noted that the use of "Tracker(s)" on the BitTorrent network is not always necessary to locate peers/clients that have file(s) being shared from a particular "Torrent." There are many publicly available servers on the Internet that provide BitTorrent tracker services.

19.    In order to locate "Torrents" of interest and download the files that they describe, a typical user will use keyword searches on torrent indexing websites, examples of which include isohhunt.com and thepiratebay.org. Torrent indexing websites are essentially search engines that users on the BitTorrent network use to locate "Torrents" that describe the files they seek to download. Torrent indexing websites do not actually host the content (files) described by "Torrents," only the "Torrents" themselves. Once a "Torrent" is located on the website

that meets a user's keyword search criteria, the user will download the "Torrent" to their computer. The BitTorrent network client program on the user's computer will then process that "Torrent" in order to find "Trackers" or utilize other means that will help facilitate finding other peers/clients on the network that have all or part of the file(s) referenced in the "Torrent." It is again important to note that the actual file(s) referenced in the "Torrent" are actually obtained directly from other peers/clients on the BitTorrent network and not the "Trackers" themselves. Typically, the "Trackers" on the network return information about remote peers/clients that have recently reported they have the same file(s) available for sharing (based on MD5 "info hash" value comparison), or parts of the same file(s), referenced in the "Torrent," to include the remote peers'/clients' IP addresses.

20. For example, a person interested in obtaining child pornographic images or videos on the BitTorrent network can go to a Torrent indexing website and conduct a keyword search using a term such as "preteen sex" or "pthc" (pre-teen hardcore). The results of the keyword search are typically returned to the user's computer by displaying them on the Torrent indexing website. Based on the results of the keyword search, the user would then select a "Torrent" of interest to them to download to their computer from the website. Typically, the BitTorrent client program will then process the "Torrent." Utilizing trackers and other BitTorrent network protocols, peers/clients are located that have recently reported they have the file(s) or parts of the file(s) referenced in the "Torrent" file available for sharing. The file or files are then downloaded directly from the computer(s) sharing

the file or files. Typically, once the BitTorrent network client has downloaded part of a file or files, it may immediately begin sharing the part of the file or files it has with other users on the network. The BitTorrent network client program succeeds in reassembling the file(s) from different sources only if it receives "pieces" with the exact MD5 hash value of that piece which is described in the "Torrent." The downloaded file or files are then stored in an area (folder) previously designated by the user and/or the client program on the user's computer or designated external storage media. The downloaded file or files, including the "Torrent," will remain in that location until moved or deleted by the user.

21.   Law enforcement can search the BitTorrent network in order to locate individuals sharing previously identified child exploitation material in the same way a user searches this network. To search the network for these known "Torrents," law enforcement can quickly identify targets in their jurisdiction. Law enforcement receives this information from "Trackers" about peers/clients on the BitTorrent network recently reporting that they are involved in sharing digital files of known or suspected child pornography, based on "info hash" MD5 hash values of "Torrents." These "Torrents" being searched for are those that have been previously identified by law enforcement as being associated with such files.

22.   There are BitTorrent network client programs which allow for single-source downloads from a computer at a single IP address, meaning that an entire file or files are downloaded only from a computer at a single IP address as opposed to obtaining the file from multiple

16

peers/clients on the BitTorrent network. This procedure allows for the detection and investigation of those computers involved in sharing digital files of known or suspected child pornography on the BitTorrent network.

23.   During the query and/or downloading process from a suspect BitTorrent network client, certain information may be exchanged between the investigator's BitTorrent client program and the suspect client program they are querying and downloading a file from. This information includes: 1) The suspect client's IP address; 2) A confirmation from the suspect client that they have pieces of the file(s) being requested, in whole or in part, and that the pieces of the file(s) are being reported as shared from the suspect client program; and 3) The BitTorrent network client program and version being utilized by the suspect computer. Third-party software available to law enforcement has the ability to log this information.

## BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE

24.   On or about January 11, 2023, Parkersburg Police Department Detective Daniel Miller, a law enforcement officer assigned to the West Virginia Internet Crimes Against Children ("ICAC") Task Force and the Violent Crimes Against Children ("VCAC") Task Force, initiated an Internet-based investigation to identify persons possessing and participating in the trafficking of child pornography using the BitTorrent P2P network.

25.   During this investigation, investigators examined records from a law enforcement program used to monitor P2P downloads on BitTorrent and located IP addresses associated with a computer believed

to be in the vicinity of Huntington, West Virginia, that had been previously identified through investigative processes as containing digital media files believed to be child pornography. The IP addresses were identified as 73.152.138.46 and 76.26.77.74 (the "target IP addresses").

26.   The program further indicated that IP address 73.152.138.46 had been logged as possessing, via a P2P file sharing program, two (2) digital media files of suspected child pornography between January 11, 2023, 9:05 PM EST, and January 13, 2023, 1:57 PM EST.

27.   The two (2) files, one consisting of seventy-eight (78) pieces and the other of three hundred eighty-seven (387) pieces, were successfully downloaded from IP address 73.152.138.46. The device at IP address 73.152.138.46 was the only IP address which shared the contents for each file downloaded, whether completed or not, and as such, each file was downloaded directly from this IP address.  Both of the files being shared that Detective Miller downloaded clearly constitute child pornography whether in part or in whole. The following files were viewed by Detective Miller and can be described as follows:

a.  **"mov_0216.mp4"** This video file depicts two (2) female prepubescent children lying on a green-colored couch/bench. One child is laying on her back with the other child laying on her back on top of the other child. An adult male penis can be seen penetrating the vagina of the child on the bottom and then penetrating the vagina of the child on top.

b.  **"(G)Paradise Birds Anna & Nelly BDSM p6_recode.avi"** This video file depicts two (2) female prepubescent children in a

bedroom near a bed. One of the children takes her top and bottom off and lays on the bed while the other clothed child ties her wrists to the headboard with pieces of rope.

28.   On or about January 30, 2023, Detective Miller filed and submitted an administrative subpoena requesting subscriber information from Comcast Cable Communications, the ISP responsible for IP address 73.152.138.46. On the dates and times when the child pornography files were downloaded by Detective Miller, the subscriber to IP address 73.152.138.46 was "Paris Sweeney," with an address of "223 31st Street W, Huntington, WV 257041201."

29.   Between March 17, 2023, 2:26 AM EST, and May 12, 2023, 6:24 PM EST, Detective Miller again initiated an Internet-based investigation to identify persons possessing and participating in the trafficking of child pornography using the BitTorrent computer network using the same law enforcement program.

30.   During that time frame, multiple connections were made between Detective Miller's investigative computer and a computer/computing device running BitTorrent software having an assigned IP address of 76.26.77.74. Seven (7) files were successfully downloaded in whole or in part from IP address 76.26.77.74. The device at IP address 76.26.77.74 was the only IP address which shared the contents for each file downloaded, whether completed or not, and as such, each file was downloaded directly from this IP address. All the files being shared that Detective Miller downloaded clearly constitute child pornography whether in part or in whole. The following files were viewed by Detective Miller and can be described as follows:

a. "000098.avi" This video file depicts a prepubescent female child being vaginally penetrated by an adult male's penis and a dildo.

b. "000238.mp4" This video file depicts a prepubescent female child being vaginally penetrated by an adult male's penis. The child can be heard crying in pain as the adult male's penis penetrates her vagina.

c. "001066.wmv" This video file depicts a prepubescent, unknown gender, child being anally penetrated by an adult male's penis. The child can be heard crying in pain as the adult male's penis penetrates their anus.

d. "001712.wmv" This video file depicts a prepubescent female child being vaginally penetrated by an adult male's penis. The male ejaculates on the child's vagina.

e. "001720.AVI" This video file depicts a prepubescent female child being vaginally penetrated by an adult male's penis. The child has the words "FUCK ME" written on her stomach with an arrow pointing toward her vagina. The video changes to another prepubescent female child digitally penetrating her own vagina while saying "fuck my pussy" to the camera.

f. "!!! New 2006 !!! Guatemala 9Yo Nena De La Calle (Sopp2) {Rare Reel Fck Good} (Kleuterkutje) (Pedo) (Ptsc) Very Good (Pthc) 12Y American Indian Girl Fucked.avi" This video file depicts a prepubescent female child laying in the backseat of a vehicle while being vaginally penetrated by an adult male's penis. The child can

be heard crying in pain as the adult male's penis penetrates her vagina.

g. **"OPVA PTHC 2015 11yo and uncle best anal fuck creampie ever!!!!!.avi"** This video depicts a prepubescent female child being anally penetrated by an adult male's penis. The child can be heard crying as the adult male's penis penetrates her and ejaculates in her anus.

31. On or about March 28, 2023, Detective Miller filed and submitted an administrative subpoena requesting subscriber information from Comcast Cable Communications, the ISP responsible for IP address 76.26.77.74. On the dates and times when the child pornography files were downloaded by Detective Miller, the subscriber to IP address 76.26.77.74 was "Paris Sweeney," with an address of "223 31st Street W, Huntington, WV 257041201."

32. On or about November 13, 2023, Detective Miller contacted your Affiant regarding the child pornography investigation utilizing the BitTorrent P2P file-sharing program. Your Affiant subsequently conducted record checks on the address 223 West 31st Street, Huntington, Wayne County, West Virginia 25704, and identified the residents as Jason Doliver McSWEENEY and his mother, whose identity is known to investigators but who shall be referred to herein as "D.M." Your Affiant conducted a criminal record check for Jason Doliver McSWEENEY and found numerous arrests for domestic violence and burglary; at the time, his most recent arrest was on October 30, 2023, for domestic violence.

33. On or about November 16, 2023, your Affiant and HSI Special Agent ("SA") Christopher Yarnell conducted a voluntary interview with

D.M. at her residence located at 223 West 31st Street, Huntington, Wayne County, West Virginia 25704. Your Affiant advised D.M. that a child exploitation investigation was associated with her IP address within the residence. D.M. agreed to be interviewed regarding the investigation. A summary of D.M.'s statements during the interview is contained in paragraphs 34 through 37 herein.

34.    D.M. advised that her husband, Paris McSweeney, died a few years ago and only herself and her son, Jason McSWEENEY, resided in her house. She had Comcast as her internet service provider, and her wi-fi router was password protected. No other people visited her residence, and no one else had the router password except for her son, Jason.

35.    Jason had bi-polar disorder and was not currently on any medication. He did not work or collect Social Security disability. Their income consisted of her husband's pension and Social Security benefits. Jason was recently arrested for domestic violence and was incarcerated. She expected to testify in court on December 6, 2023, regarding his arrest.

36.    D.M. had a desktop computer in her family room, next to the front door of her residence, and a personal cellphone. She was not aware of Jason viewing child pornography, but she acknowledged he watched videos on the desktop computer and an Amazon tablet. However, she did not know what he watched because she was legally blind and would not be able to view any images on the computer.

37.    D.M. further stated that Jason had one of her old cellphones and one of her old Amazon tablets in his bedroom. She allowed your Affiant and SA Yarnell to look in Jason's room to find his electronic

devices. Your Affiant asked D.M. if she would sign a Consent to Search form regarding the desktop computer, her old cellphone, and her old Amazon tablet. She subsequently agreed to allow HSI Charleston to conduct a computer forensic review of the aforementioned items by signing the document. Your Affiant provided D.M. an inventory of the three items to be taken for a computer forensic review.

38.    Because D.M. had represented during the interview that the cellphone and Amazon tablet were used by her son, on or about May 28, 2024, HSI Charleston obtained a federal search warrant for those devices. HSI Charleston conducted a computer forensic review of the cellphone and the Amazon tablet and found no Child Sexual Abuse Material (CSAM).

39.    On or about October 3, 2024, HSI Charleston Computer Forensic Analyst ("CFA") Leland Pickering submitted a Digital Forensic Examination Report pertaining to his review of the desktop computer. CFA Pickering identified 5,533 images and 9 videos of suspected CSAM and/or child erotica on the desktop computer. CFA Pickering also identified four Microsoft email addresses associated with the BitTorrent software and/or the web browsers used to search for CSAM: jsnmcsweeney@outlook.com, jsnmcsweeney1@outlook.com, jsndlvmcs@outlook.com, and fortextnowjsnmcs@outlook.com.

## BACKGROUND CONCERNING MICROSOFT

40.    Microsoft provides its users cloud-based accounts that allow users cloud access from internet-connected devices to send, receive, and store emails online. Microsoft accounts are typically identified by a single login, which typically derives from a subscriber's email address.

41. Based on my training and experience, I have knowledge that Microsoft allows subscribers to obtain accounts by registering on Microsoft via an email address. During the registration process, Microsoft may ask subscribers to create a username and password, and to provide basic personal information such as a name, an alternate email address for backup purposes, a telephone number, and in some cases a means of payment.

42. Thus, a subscriber's Microsoft account can be used to store email, other types of electronic communication, including instant messaging, photo and video sharing, voice calls, video chats, SMS text messaging, and social networking, contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on cloud-based servers. Based on my training and experience, I have knowledge that evidence of who controlled, used, and/or created a Microsoft account may be found within such computer files and other information created or stored by the Microsoft subscriber. I also have knowledge that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

43. Based on my training and experience, I know that providers such as Microsoft also collect and maintain information about their subscribers, including information about their use of Microsoft services. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used

to connect to the account (such as logging into the account via a Microsoft login), and other log files that reflect usage of the account. Providers such as Microsoft also commonly have records of the IP address used to register the account and the IP addresses associated with other logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account. Also, providers such as Microsoft typically collect and maintain location data related to subscriber's use of Microsoft services, including data derived from IP addresses and/or GPS data.

44. Based on my training and experience, I have knowledge that providers such as Microsoft also collect information relating to the devices used to access a subscriber's account, such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by Microsoft in order to track what devices are using Microsoft's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I further submit that such identifiers may constitute evidence of the offense under

investigation because they can be used (a) to find other Microsoft accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the Microsoft account.

45. Based on my training and experience, I have knowledge that providers such as Microsoft use cookies and similar technologies to track users' web history through use of cookies. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's device. When that device visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to Microsoft. More sophisticated cookie technology can be used to identify users across devices and web browsers. From my training and experience, I have knowledge that cookies and similar technology used by providers such as Microsoft may constitute evidence of the offense under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a Microsoft account and determine the scope of criminal activity.

46. Based on my training and experience, I have knowledge that Microsoft may maintain records that can link different Microsoft accounts to one another, by virtue of common identifiers, such as common email addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single

person, or single group of persons, used multiple Microsoft accounts. Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular Microsoft account.

47. Based on my training and experience, I have knowledge that subscribers can communicate directly with Microsoft about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers such as Microsoft typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by Microsoft or the user as a result of the communications. I further submit that such information may constitute evidence of the offense under investigation because the information can be used to identify the account's user or users.

48. In summary, based on my training and experience in this context, I believe that the computers of Microsoft are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved email for Microsoft subscribers), as well as Microsoft-generated information about its subscribers and their use of Microsoft serves and other online services. In my training and experience, all of that information may constitute evidence of the offense under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide Microsoft with false information about their identities, that

false information often nevertheless provides clues to their identities, locations, or illicit activities.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

49.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), by using the warrant to require Microsoft to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### CONCLUSION

50.    Based on the foregoing, I request that the Court issue the proposed search warrant.

51.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Microsoft. Because the warrant will be served on Microsoft, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Further your affiant sayeth not.

_____
TERRANCE L. TAYLOR
SPECIAL AGENT
HOMELAND SECURITY INVESTIGATIONS

Signed and sworn to by telephonic means on this __13th__ day of December, 2024.

_____
JOSEPH K. REEDER
UNITED STATES MAGISTRATE JUDGE